WALKER vs STILSON.

Opinion delivered January 8, 1898.

*Delay in Shipment—Hearsay Testimony.*

Appellee shipped certain cattle over appellants railroad to East St. Louis. By reason of delay on defendants road these cattle did not reach East St. Louis at the time expected. The cour

permitted appellee to testify in regard to what his agents told him in regard to the fall of prices on the St. Louis market and the necessity for shipping same to Chicago. *Held*, Hearsay testimony and incompetent.

Appeal from the United States Court for the Northern District.

WM. M. SPRINGER, Judge.

Suit by Stilson, Case, Thorp, Ryburn & Co. against Aldace F. Walker and an other as receivers of the St. Louis & San Francisco Railway Co. Judgment for plaintiff. Defendant appeals. Reversed.

This was an action brought by the appellees (the plaintiffs below) against the appellants (the defendants below) for damages for refusal to ship certain cattle from Catoosa, Ind. T. The plaintiffs alleged in their cemplaint that on or about the 10th day of July, 1894, the defendants had possession and control of, and, through their agents, servants, and employes, operated, the St. Louis & San Francisco Railway Company, together with its tracks, cars, locomotives, and other appurtenances, and were common carriers of live stock and goods for hire from the town of Catoosa, Ind. T., to St. Louis, Mo., and from said St. Louis, Mo., through its connecting and forwarding lines, to East St. Louis, in the state of Illinois; that on or about the 8th day of July, 1894, the defendants assumed and contracted, as such common carriers, to furnish and supply at the town of Catoosa, Ind. T., a station on the line of said railway, to said plaintiffs, on the 10th day of said July, 1894, 12 cattle cars, suitable and proper for the transportation of cattle, which said cars, when loaded with cattle, were to be transported from said station of Catoosa, Ind. T., to the National Stock Yards, at East St. Louis, in the state of Illinois. They al-

(46)

lege further that the defendants were informed and knew that said cattle were being shipped for market, and that the cars for their shipment were to be delivered and loaded at said station in time, if possible, for the market of the following day, and at least for the early market of the 12th day of July, 1894. Plaintiffs further allege that they delivered on the said 10th day of July, 1894, 299 head of beef cattle, and placed the same in the stock yards of said defendants at their said station, divided into car-load lots, as directed by the agent of said defendants, who so directed that they might be ready for loading on said 10th day of July, 1894. They further allege that although said cars were there, sufficient and ready for loading said cattle, said defendants negligently, and contrary to their duty in the premises, failed and refused to permit plaintiffs to load their cattle into said cars, or to transport them from said station of Catoosa, Ind. T., nor were said cattle loaded upon said cars and started from the said station of Catoosa, Ind. T., until early on the following morning of July 11th. They further allege that, in consequence of such delay and negligence on the part of said defendants, said cattle did not arrive at the National Stock Yards until about 10 o'clock on the morning of July 12, 1894, at which time the market at said place had closed, owing to the butchers' strike in the city of Chicago, in the state of Illinois. They further allege that if the cattle had been loaded on the morning of the 11th of July, and had been run through to the National Stock Yards within the usual time, they would have reached the same by 7 o'clock of the following day, and in ample time for the early market of said day. They further allege that, owing to the failure of the defendants to deliver said cattle in time for the early market of the 12th of July, said cattle could not be sold at all at the National Stock Yards, in East St. Louis, in the state of Illinois, knowledge of which strike was communicated from Chicago to the National Stock Yards, at

East St. Louis, in the state of Illinois, at about 10 o'clock on the said 12th day of July, 1894, and said cattle had to be shipped on to Chicago for sale, and were sold on said market on the 16th day of July, 1894, at which time the market price of said cattle had greatly declined, and said cattle had greatly diminished in weight, by which decline in market price and great shrinkage in weight these plaintiffs have been greatly damaged, in the sum of $1,870.43. They further allege that in consequence of being compelled to hold said cattle over, and to reship them to the Chicago market, they were compelled to pay out money for feeding and care of said cattle which they would not have otherwise had to do, as well as extra freight for their conveyance to the said Chicago market. Wherefore they asked for judgment for $2,-170.43 and costs of suit. On the 19th day of September, 1895, defendants filed an answer, and on the 4th day of February, 1896, filed an amended answer, to the complaint of the plaintiffs, in which defendants deny that they were on the 10th day of July, 1894, common carriers between St. Louis, Mo., through any connecting and forwarding lines, to East St. Louis, in the state of Illinois. Deny that they contracted on the 8th day of July, 1894, to furnish cars to be loaded with cattled to be transported from Catoosa, Ind. T., the National Stock Yards, at East St. Louis, in the state of Illinois. Deny that they were informed and knew that said cattle were being shipped for market, or that said cattle were to be delivered and loaded in time for the market of the next day, or the early market of the 12th of July, 1894. Defendants deny that they failed and refused to permit plaintiffs to load said cattle. Deny that they were guilty of any negligence which delayed the arrival of said cattle at National Stock Yards, at East St. Louis, in the state to Illinois, until about 10 o'clock on the morning of the 12th day of July, 1894. Deny that they are liable for any damage owing to the butchers' strike in the city of Chicago,

in the state of Illinois.   Deny that they were guilty of any negligence whatever on account of the nonarrival of said cattle at the National Stock Yards, at East St. Louis, in the state of Illinois.   Deny that there was any agreement or understanding between said plaintiffs and defendants that the cattle should arrive at the National Stock Yards, at East St. Louis, in the state of Illinois, by 7 o'clock on the 12th day of July, 1894, and in ample time for the market of that day.  Deny that said cattle could not be sold at all at the National Stock Yards, at East St. Louis, in the state of Illinois, on said market.   Deny that they are in any wise responsible to said plaintiffs on account of said strike in the city of Chicago and state of Illinois, knowledge of which was communicated to the National Stock Yards, at East St. Louis, in the state of Illinois, about 10 o'clock on the morning of said 12th day of July, 1894.   Further deny that said cattle had to be shipped to Chicago for sale, and were sold on said market on the 16th day of July, 1894.   Further deny that the market price for said cattle had greatly declined, and that said cattle had greatly diminished in weight, and further deny that said plaintiffs have been damaged in any sum whatever for which the defendants are responsible. They deny that their agent at Catoosa, Ind. Ter., had any right or authority to bind these defendants for the delivery of the cars, or the transportation of said live stock to the National Stock Yards, at East St. Louis, in the state of Illinois.   And for a further defense the defendants aver that there was a strike of railroad employes in the city of St. Louis upon the lines of connecting carriers at St. Louis, over which lines said cattle would have to be transported to reach said National Stock Yards, at East St. Louis, in the state of Illinois ; that said plaintiffs were fully advised of said strike, and further advised on the 10th day of July, 1894, that the said Missouri Pacific Railway Company, on account of said strike, had no crews, on its lines in the city

of St. Louis, Mo., to handle any cars of freight thereupon between the hours of 7 p. m. and 7 a. m., at said time, and had given notice that no freight would or could be handled between said hours. And further aver that the end of its line at St. Louis is at Chouteau avenue, in St. Louis, and that at the said time the only connecting carrier which could handle the said cars of defendants was the said Missouri Pacific Railway Company, and that in order to complete the carriage of any live stock to the National Stock Yards, at East St Louis, in the state of Illinois, said live stock must be delivered to the said Missouri Pacific Railway Company, and then to the Terminal Railroad Association of St. Louis, a common carrier by rail, which handles all freight from Twelfth street, on the line of the Missouri Pacific Railway Company, in St. Louis, to the National Stock Yards, at East St. Louis, in the state of Illinois ; that said defendants had no control over said striking switchmen or railroad employes of said Missouri Pacific Railway Company, nor any control over the striking employes of said Terminal Railroad Association of St. Louis, which companies could not handle any freight at night, or between 7 o'clock p m. and 7 o'clock a. m., on account of a strike on their lines at the time mentioned in plaintiff's complaint. They further aver that said cattle arrived at the terminus of their line in the city of St. Louis at 6:20 a. m. on the morning of July 12, 1894 ; that these defendants promptly notified the Missouri Pacific Railway Company and the Terminal Railroad Association of St. Louis of the arrival of said cars of stock to be transported over their lines to the National Stock Yards, at East St. Louis, in the state of Illinois. And aver that these cattle were transported over defendants' line without any negligence or delay. Further aver that the plaintiffs were duly informed about the strikes on the lines connecting with the defendants. They further aver that a written and printed contract was entered into

between plaintiffs and these defendants for and by the terms of which, only, were the cattle to be transported; that said written contract provided that said cattle were not to be shipped within any specific time, nor delivered at the destination at any particular hour, nor in season for any particular market. By the terms of said contract the defendants were exempted from liability on account of loss caused by any mobs, strike, or threatened or actual violence, and all liability of these defendants absolutely ceased and terminated upon delivery by them of said cars of cattle to their connecting carriers, and that each carrier was only liable for such damage as was caused by its own negligence on its own line of railway. Defendants deny that the agent of defendants at Catoosa, Ind. Ter., had any authority to make any contract for the carriage of said cattle by defendants from Catoosa, Ind. Ter., to the National Stock Yards, at East St. Louis, in the state of Illinois, unless in writing, and authorized by these defendants, and allege that said plaintiffs were fully aware thereof; and, with other averments set out in their answer as matters of defense, they deny any and all damage.

On the 26th day of February the case was tried before a jury, and under the instructions of the court the jury returned special findings as follows: Item 1, difference in market price, $968; item 2, shrinkage in excess of customary shrinkage, $154.45; item 3, expenses of reshipment to Chicago, $300; amount, $1,432.46,—and also returned a general verdict for said amount of $1,432.46. On the 14th day of March, 1896, the defendants moved the court for a new trial, which was overruled; and judgment rendered upon the verdict of the jury, whereupon the defendants moved in arrest of judgment; which said motion was overruled by the court, whereupon the defendants prayed for an appeal to this court, with leave to file a bill of exceptions; and afterwards, on the 8th day of May, 1896, they filed in the office of

the clerk of the United States court of the Indian Territory, Northern district, at Vinita, their bill of exceptions in said cause. Said bill of exceptions contains the evidence submitted to the jury, both by plaintiffs and defendants and also the defendants request by their counsel of certain instructions to be given to the jury, which requests were denied, and the court instructed the jury as follows: "Gentlemen of the jury, you are instructed that if you believe from the evidence that plaintiffs contracted with defendants' agent at Catoosa, Indian Territory, that defendants would furnish cars in which to ship cattle at a time certain, and that said agent failed to receive and ship said cattle at the time agreed upon, and that, by reason of the failure to receive and ship said cattle, plaintiffs were damaged, then plaintiffs are entitled to recover. And, in determining whether their agent had authority to make such a contract, you may consider the nature of the business intrusted to him, and the course of business pursued by the defendants. The measure of damages will be the difference between the fair market value of the plaintiffs' cattle in the condition they were in at the nearest market at which such cattle could have been sold after their arrival at their destination, East St. Louis, Ill., and their fair market value at the same place had they arrived at the time they should and would have arrived there had the cars been furnished according to the contract between plaintiffs and defendants, if you find the same existed, and the cattle carried with reasonable care and diligence. You may further take into consideration, in estimating the damages, the actual shrinkage, if any, caused by the negligence of the defendants; and this loss is to be determined by the state of the market at the time said cattle might have arrived, had the plaintiffs been furnished cars pursuant to contract, if such contract existed. And you must further take into consideration the amount plaintiffs actually got for their cattle. But it is in evidence that plaintiffs shipped

their cattle to Chicago for sale, and you are therefore in-
structed that if plaintiffs, under the circumstances, acted as
an ordinarily prudent person would have done under similar
circumstances, the damage will be the difference between
market value of their destination, as before explained, and
what they sold for, together with their actual shrinkage, as
charged before, and the additional costs plaintiffs were put
to in payment of freight, feed, and hand hire.   A station
agent of a railway company has not, by mere reason of be-
ing such station agent, and authorized as such to receive
freight for shipment, and issue bills of lading therefor, the
authority to make a contract and receive and ship freight to
points beyond the line of railway for which he is agent; and
in this case, before you would be authorized in finding that
the defendants had contracted to carry the cattle of plaintiffs
to a destination beyond where the defendants' line reached,
you must find from the evidence that the defendants, or some
one thereto authorized by them, made such a contract.   You
are instructed that the giving of a through rate of freight by
a station agent of the railway company does not of itself
evidence a contract made by such agent, or by the company
he represents, to transport the cattle over a connecting line
of road to the destination to which the rate is fixed, and does
not of itself evidence a contract under which the railway
company would be liable for the acts or negligence of the
connecting carriers, or any loss that occurred upon such
connecting lines.   If the jury find from the evidence that, in
order to reach the point to which, plaintiffs' cattle were
shipped, it was necessary for such cattle to pass over another
or other lines of railway than the one operated by the de-
fendants, no negligence on the part of such other line or
lines, if there was any, would render the defendants liable
for damages, in the absence of an express agreement made
on the part of the defendants by some authorized agent to
transport the cattle to the point of destination within a given

time. If the jury believe from the evidence that had the cattle of the plaintiffs been loaded at the time of their arrival at Catoosa, and had been promptly started from there by the defendants, they would not have reached East St. Louis at an earlier hour than they did reach there, then the plaintiffs could not recover any damages for the time the cattle remained at Catoosa waiting to be loaded. You are further instructed that the usual and ordinary shrinkage which cattle sustain in shipment in the course of their transportation from Catoosa, in the Indian Territory, to the National Stock Yards, at East St. Louis, in Illinois, is one of the incidents of said shipment, and that under no circumstances are defendants responsible for such ordinary, usual, and customary shrinkage; and, before you can find them liable for any shrinkage, it must be for the shrinkage which was caused by their express negligence, and was in excess of the usual and customary shrinkage of all such classes of shipments. If, under the testimony in this case, and instructions as given you by the court, you should find that there was any liability on the part of the defendants to the plaintiffs, it would be your duty to ascertain the amount of the damages resulting; and in the investigation of that question, upon that portion of it relating to shrinkage, it would be your duty to ascertain from the proof what, if any, shrinkage there was, directly attributable to the negligence of these defendants, and which, if any, of it occurred between the time the cattle reached Catoosa and the time they were shipped, and what, if any, of it that was directly attributable to the delay in shipment occurred in the ordinary course of shipment, and would have occurred, as shown by the testimony, if there had been no delay in the transportation of the cattle; and in this connection you may consider whether there was any greater shrinkage of these cattle by reason of their remaining in the yards from the afternoon of the 10th until the morning of the 11th, before they were loaded and shipped,

than would have occurred had they been loaded promptly upon their arrival at Catoosa, and shipped from there immediately after loading; and in this connection consider all the evidence tending to show the length of time required to make the run from Catoosa to the National Stock Yards, and any testimony tending to show that, had they left Catoosa immediately upon being loaded, they would have been delayed by reason of labor troubles ( a strike upon the Missouri Pacific ) so that they would not have reached the National Stock Yards at an earlier time than they did. Under the pleadings of this case, the right of the plaintiffs to recover anything rests upon their being able to prove by a preponderance of the evidence that the loss claimed to have been suffered by them, if the proof shows you any loss was suffered, was the natural, direct, proximate result of some negligence on the part of the defendants. The court instructs the jury that, if you find for plaintiffs, you will state in your verdict the items upon which you have computed the damages, and of what they consist, specifying each item, and the amount allowed under the same, and such findings shall be stated in writing.   A form for such finding is hereto attached:    'Stilson, Case, Thorp, Ryburn & Co. vs. Receivers St. L. & S. F. Ry. Co.  Special findings of jury.   We, the jury, in estimating the damages of plaintiffs, find the damages as follows, and that said damages consist of the following items, and the damage to each of the said items is as follows:  Item 1, difference in market price, ————; item 2, shrinkage in excess of ordinary shrinkage, ————; item 3, expenses of reshipment to Chicago,————.' "

*L. F. Parker, P. L. Soper* and *G. B. Denison,* for appellants.

*William T. Hutchings* and *Albert Z. English,* for appellee.

TOWNSEND, J. ( after stating the facts ). Some quite interesting questions of law are presented by this record, as, for instance, whether the local agent at Catoosa had authority to contract for delivery of the cattle at a time certain, when the terminus of the shipment was beyond the line of the road operated by defendants ; whether the strike of the butchers in Chicago, unknown when the shipment was made should have been allowed to go to the jury for their consideration in estimating the amount of damages ; whether the delay caused by striking employes on the Missouri Pacific and St. Louis Terminal lines in St. Louis, and beyond the terminus of defendants' road, could bind the defendants. Besides these questions, many others are presented by the record. and the appellants have filed 31 specifications of error. But, in the view we take of the record, it is necessary to consider only the fourth, fifth, and seventh specifications of error, which are as follows, to wit : "(4) That the court erred in permitting the witness S. M. Thorp to testify, in response to a question of plaintiffs' counsel, over the objection of the defendants ( which said objection was duly saved by an exception ), as to the price the cattle brought in Chicago. (5) That the court erred in permitting the witness S. M. Thorp to testify, in response to a question of plaintiffs' counsel, over the objection of the defendants ( which said. objection was duly saved by an exception ), as follows: Q. Did you ever pay anything, Mr. Thorp, for the reshipment of the cattle from East St. Louis to Chicago?" "(7) That the court erred in permitting the witness S. M. Thorp to testify, in response to a question by plaintiffs' counsel, over objection of defendants, ( which said objection was duly saved by an exception ), to the fact that the cattle were reshipped from East St. Louis to Chicago, when the only source of information of witness was hearsay." These relate wholly to the admissibility of testimony, and we have copied that part of the testimony of S. M. Thorp relating to these specifications:

"Q. What became of those cattle, Mr. Thorp? A. They kept them there until the 13th, the next day,—the 14th would be Saturday. Then they shipped them to Chicago for sale. Mr, Soper: Q. Were you there? A. No, sir. (Counsel for defendants objects to his stating what became of the cattle, on the ground that it would be hearsay, and moves the court to strike out his answer to the question). Mr. Hutchings: It will be withdrawn. Q. What became of those cattle? A. They were shipped to Chicago. Q. How do you know the cattle were shipped to Chicago? A. I received the returns of the sale from Godair, Harding & Co. Q. Have Godair, Harding & Co. a place of business in Chicago? A. They run under that name. and have offices in Chicago, St. Louis, and Kansas City. Q. Did Godair, Harding & Co. have the authority, express or implied, from you, to ship those cattle, or any cattle,—or, we will say, those cattle from East St. Louis,—to the Chicago market? A. It is supposed that our commission men will use their best judgment. Q. In what event do you instruct them to ship from the East St. Louis market to Chicago? A. If they cannot get a satisfactory price, to send them to Chicago. That was the general understanding, Q. What did those cattle bring you in Chicago, per hundredweight? (Counsel for the defendants objects to the question on the ground that it is not the best evidence, unless the witness was present. If he had a commission man, he should have taken his deposition. How does he know but what this commission man sold some other cattle? I object to what his commission man ever told him or wrote him, as being incompetent and improper). The court: The witness has stated that he authorized his commission merchants at East St. Louis, if they could not obtain a satisfactory price, to ship the cattle to Chicago. Mr. Soper: He says that was the general understanding. The court: I understood him to say that he authorized them, in all shipments, and in-

cluding this shipment, if they could not get a satisfactory price in East St. Louis, to ship to Chicago. Q. Is that what you said? A. Yes, sir. The court: And that he was advised by his commission merchants that they were shipped to Chicago, and that he got his returns from the commission house in Chicago. The objection is overruled. (To which action of the court in so overruling said objection the counsel for the defendants then and there duly excepted). A. $2.40. Mr. Soper: We move to strike out the answer on the ground that, from the testimony of Mr. Thorp, it is merely hearsay, and is not the best evidence. (Which said motion to strike out is by the court overruled. To which action of the court in so overruling said objection or motion to strike out the counsel for the defendants then and there duly excepted). Q. Did you ever pay anything, Mr. Thorp, for the reshipment of the cattle from East St. Louis to Chicago? (Counsel for defendants object to this question on the ground that it is not a part of the measure of damages in this case. It has been shown that the cattle arrived at East St. Louis on the 12th of July, 1894, four hours before the market closed ; and there is no evidence in the case showing that it was necessary for the protection of the best interests of the plaintiffs th at these cattle should be transported to Chicago, so as to charge these defendants with the cost of transportation of those cattle to Chicago. Nor is it shown that they might not have been sold in East St. Louis subsequent to that day ; it already being in evidence that there was a market on the 13th day of July, 1894). The court: This testimony would be irrelevant and incompetent if it appeared that the market was as good in East St. Louis, all things considered, as it was in Chicago, and, unless it should appear by subsequent testimony that that fact is brought out, it will be incompetent ; but it may be submitted at this time, assuming that it will be made relevant later on. Mr. Hutchings: It has been proven that

these cattle were left with the commission merchants who had offices in Chicago, St. Louis, and Kansas City. It is presumed that they were acquainted with the market, and that they would not have shipped the cattle to Chicago if it had not been for the protection of the interests of the plaintiffs. I have proven that the market was getting lower all the time in St. Louis. The court: The court is of the opinion that some evidence should be introduced by the plaintiffs to show that, when he shipped these cattle to Chicago, he could have done better with them there than anywhere else. Mr. Hutchings: I have shown that the day we arrived in East St. Louis the market was completely closed down, and the next day it was still lower. It is for the jury to say whether, if they had been in our commission man's place, they would have sent the cattle to Chicago. The court: The court is of the opinion that all evidence that tends to show the condition of the market may go to the jury. The objection is overruled. (To which action of the court in so overruling said objection she counsel for the defendants then and there duly excepted.) Q. How much did you pay, Mr. Thorp? A. $255 additional expenses, and $37 for the extra amount of feed. Q. Extra amount of feed. A. On account of the delay in taking our cattle to Chicago, he had to buy extra feed. Q. Did you have to employ a man to accompany the cattle? A. Yes, sir. Q. How much did you pay him? A. $8. Mr. Soper: Were you there? A. No, sir. Mr. Hutchings: Q. You paid for it, did you? A. Yes, sir. Mr. Soper; I move to strike that part of his testimony out, for the reason that it is based entirely upon hearsay, and not upon facts within his own knowledge. The Court: I think these facts come within the res gestæ of the case. The motion to strike out is overruled. (To which action of the court in so overruling said objection to strike out the counsel for the defendants then and there excepted.) Q. Mr. Thorp, Godair, Harding & Co., were your author-

ized agents, were they? A. Yes, sir. Q. When does the greatest shrinkage in cattle occur? A. After they have been shipped to market, and unloaded, and fed and watered, then is the time that they are in the best condition to go on the market. As soon as they have had a drink of water and been fed their hay, then they are in the best condition they will ever be in. They don't take a second fill. After the first fill, then there is a general decline in weight; and, if they go any length of time, there is quite a shrinkage. There is a shrinkage in the pounds of flesh, as well as the offal, the longer they are delayed.''

Cross examination: "Mr. Soper: Q. As a matter of fact, you left the disposition of your cattle entirely with your commission man?. A. We have to do so. We cannot be on the market ourslves. Q. You know none of these facts, except by hearsay? A. I have the word of my men. Q. I mean, you have been informed by some one? A. Yes, sir. Q. You were not there yourself? A. No, sir. Q. Whatever was done was done by Godair, Harding & Co., without consulting you? A. They have a right to use their best judgment. Q. I was asking as to the facts in the case. A. Yes; in this case and in all cases. Q. You testified, I believe, Mr. Thorp, that these cattle wore sold in Chicago for $2.40 per hundred weight? A. Yes, sir. Q. Your cattle would average about 925 pounds? A. We thought so. Q. I have here the National Live Stock Reporter, published at East St. Louis, for July 16, 1894, which shows the market at East St. Louis on the same day you sold your cattle in Chicago. That was the day on which you sold your cattle? A. Yes, sir. Q. I notice here, in reference to the Indian and Texas steers, as follows: '24 steers, 938, 265; 20 steers, 917, 280; 21 steers, 899, 280.' Was the market in Chicago any higher than it was in East St. Louis on that day? A. I don't know that I can tell you. Q. Was the market any better in

Chicago on that day than it was at East St. Louis? A. I don't know.''

Redirect examination: ''Mr. Hutchings: Q. Have you at any time since had any conversation with either of your commission men about the shipment of those cattle from East St. Louis to Chicago? A. Yes, sir. Q. Has either of them personally informed you that those cattle were reshipped from East St. Louis to Chicago? (Counsel for the defendants objects to the question on the ground that it is leading, and puts the language in the witness' mouth, which objection is by the court sustained.) Q. How do you know they were reshipped from East St. Louis to Chicago? (Objected to by counsel for the defendants on the ground that it is incompetent and irrelevant, because the witness has already testified that he was not present, which objection is by the court overruled. To which action of the court in so overruling said objection, counsel for the defendants then and there duly excepted.) Q. How do you know that those cattle were reshipped from East St. Louis to Chicago? A. By the returns that I have received from there. Q. Did anybody ever personally tell you so? (Objected to by the counsel for the defendants on the ground that it is leading, which objection is by the court overruled. To which action of the court in so overruling said objection, the counsel for the defendants then and there duly excepted.)

It appears that Anderson, who went to St. Louis with the cattle, arrived there at about 9 o'clock a. m. of July 12th, and that he left St. Louis about 2 o'clock p. m. of that day. What became of those cattle after that is testified to by no witness with any knowledge of the facts. All that Mr. Thorp testified to was wholly hearsay testimony. Whether the cattle could have been sold in East St. Louis, whether any necessity existed to ship them to Chicago, whether they ever were shipped to Chicago, is testified to by

whether they ever were shipped to Chicago, is testified to by no one with any knowledge of the facts. We do not think that Mr. Thorp was a competent witness to these facts, and his testimony should have been excluded as hearsay. We do not think damages can be proven by this kind of testimony, and therefore the case should be reversed and remanded.

CLAYTON and THOMAS, JJ., concur.